Good Milking Machine Company, Appellant, v. William Galloway et al., Appellees.

RE-FORMATION OF INSTRUMENTS: Evidence—Sufficiency to Jus-
1 tify Re-formation. Evidence is ''clear and satisfactory'' within the meaning of the rule governing the re-formation of written instruments, when such that the mind readily reaches a satisfactory conclusion that the parties did not in writing up the contract use such words as aptly expressed that which they mutually intended to express.

RE-FORMATION OF INSTRUMENTS: Mistaken Use of Words.
2 Evidence reviewed and *held* to clearly show the parties had mutually agreed that both parties should have the right to forfeit the contracts, under certain conditions, and had failed, in writing up the contract, to use apt words to express such agreement, thereby justifying re-formation of the writing.

RE-FORMATION OF INSTRUMENTS: Evidence—Oral—Surround-
3 ing Circumstances—Nature of Subject-Matter. Evidence consists not alone of oral words spoken. Sometimes the surrounding circumstances and the nature of the subject-matter of the contract may throw a stronger light on the ultimate question than the naked testimony of witnesses.

RE-FORMATION OF INSTRUMENTS: Grounds—''Mistake of
4 Law.'' To so re-form a writing that the right to forfeit the contract is mutual, such being the actual contract of the parties, is not reforming ''a mistake of law.''

PRINCIPLE APPLIED: Plaintiff and defendants actually agreed that each should have the right to forfeit the contract under certain conditions. In reducing their contract to writing they employed these words: ''The parties of the second part agree to push the sales of the aforesaid machines in good faith, and should they fail to sell the number hereinbefore required, then said contract may be forfeited.'' This language was used

under the mistaken belief by each party that it was broad enough to cover the right of forfeiture by either party. *Held,* not a mistake of law but a mistake in the use of words to express the actual agreement.

*Appeal from Black Hawk District Court.*—HON. C. W. MULLAN, Judge.

SATURDAY, JANUARY 23, 1915.

ACTION to reform a contract. Decree for the defendant. Plaintiff appeals.—*Affirmed.*

*Feely & Feely, Mears & Lovejoy,* for appellant.

*William & Clark, B. F. Swisher,* for appellees.

GAYNOR, J.—The plaintiff and defendants entered into a written agreement by the terms of which the defendants agreed to purchase and pay for certain milking machines, and to pay a royalty upon certain can valves and pulsators. The action is brought to recover these royalties claimed to be due under the contract.

The defendants answered plaintiff's petition, the material part of which is to the effect that the contract, as written, did not express the true agreement of the parties; that the contract, as actually entered into between the parties, provided that either party should have the right and privilege to cancel, abandon, terminate and declare said contract at an end, should the defendants fail to sell the number provided in said contract, after having diligently pushed the sale in good faith; that the last paragraph of the contract sued on fails to embody the full intent and meaning of the parties to said contract, in that said contract omitted and failed to express such agreement, and defendants say that the contract omitted and failed to express such agreement, and defendants say that the contract was intended by the parties to said agreement to read as follows:

"The parties of the second part agree to push the sale of the aforesaid machines in good faith, and should they fail to sell the number of machines herein required, then this contract may, by either the first or second parties, be declared terminated, cancelled, and at an end," while the contract as set out by the plaintiff reads:

"The parties of the second part agree to push the sale of the aforesaid machines in good faith, and should they fail to sell the number of machines hereinbefore required, then the contract may be forfeited."

Upon the filing of this answer, a motion was made to transfer this issue to the equity side of the calendar for trial, which was accordingly done. Thereafter, this issue alone came before the court for trial, and the court, after hearing the testimony submitted, entered the following decree:

"The last paragraph of the contract is re-formed to conform to the intentions of the parties, and such contract when so re-formed, reads as follows: 'The parties of the second part further agree to push the sale of the aforesaid machine in good faith, and should they fail to sell the number of machines hereinbefore required, then this contract may be cancelled, and terminated by either party thereto.'"

From this finding and decree, the plaintiff appeals.

This case presents questions of fact only. We think the law has been well settled upon the controversy here presented.

It appears that under the contract set out in plaintiff's petition, the plaintiff granted to the defendants the exclusive right to manufacture and sell certain milking machines, and that the defendants agreed to pay the plaintiff certain royalties upon the machines manufactured and sold. This is a sufficient statement of plaintiff's contention to give an understanding of the controversy that arises here.

Count Five of defendants' answer is alone involved. This count sets out facts upon which is predicated a right to have the last paragraph of the written instrument re-formed. This paragraph, as it appears in the contract set out by the plaintiff, reads as follows:

"The parties of the second part further agree to push the sale of the aforesaid machines in good faith, and should they fail to sell the number of machines hereinbefore required, *then this contract may be forfeited.*"

It is apparent, from this provision of the contract sued on, that someone had a right to forfeit this contract at some time, and under certain conditions. It seems to be the plaintiff's contention that it alone had the right. The defendants' contention is, that *either* had the right, and that the contract does not express the latter meaning, although this was the express agreement and understanding of the parties at the time the contract was entered into.

The defendants' contention is, that if it should appear or should be found impossible to sell the number of machines specified in the contract, after an attempt on their part to carry out and perform all the conditions of the contract, then either party might terminate the contract; that the paragraph, hereinbefore set out as appearing in the signed contract, was intended to express such understanding and agreement, and that the persons in preparing it failed to use apt language to express the same; that such mistake was a mutual mistake of the parties to the contract at the time the same was executed.

It appears that there was an original draft of this contract, and that it contained a provision substantially as follows—that the parties of the second part should push the sale of the aforesaid machines in good faith, and should they fail to sell the number of machines provided in said contract, it might be forfeited *at the option of the party of the first part.*

It appears that Galloway, one of the defendants, ob-

jected to this provision because it limited the right to *forfeit* the contract *to the party of the first part.* In the written instrument that was finally signed, after the contract had been rewritten by someone, the words, ''by the party of the first part,'' were omitted, and it so appears in the contract sued on.

Mr. Galloway testified in substance: ''I think there was a contract written prior to the signing of the contract attached to plaintiff's petition. This was submitted to me by either Mr. Hummel or Mr. Good. The milking machine was in the candy factory at the time. Had several interviews with Mr. Sedgwick and we discussed the contract together. I remember having discussed with some of them as to whether there should be a clause for the cancelling or abandoning of the contract. I told them I would not sign the contract unless there was an understanding between us with reference to the outcome of the machine, which was a theory at that time. I told them that if the machine did not sell and did not work, that I would reserve the right to forfeit the contract, and I meant by that, that it could be cancelled at any time as soon as it was proven that it was not selling, and was not a success. I first had a conversation with Mr. Good as to the subject matter of the contract. This was several weeks before the contract was made.'' He further said that he could not tell when or where any of the particular conversations took place, or who was present at any particular time when the conversations occurred; that they talked together a good many times; that he had a conversation with Good and Hummel and Sedgwick with reference to the terms of the contract before it was executed. ''I discussed the terms and provisions of the contract at a time when all three were present. At the time when they were all three present, it was said that if the machine did not make good that the contract would be forfeited. The machine was brought to us and reported to be a positive success. We made the contract on that ground only.''

He was asked this question: ''What was said with reference to the subject?''

A. "It was said, 'You need not worry, Galloway, if the thing is not all right, we will make it all right,' and I said, 'I want to be sure about it, and I want the right to cancel the contract and forfeit it,' and they said, 'All right, we will give you that right.' I cannot tell which of them said it, but they were all present. It was mutually agreed that it would be cancelled if the thing was not satisfactory, if we wanted to forfeit it. At the time of this conversation, I think they brought out a draft of a contract and we read it over, and I asked that this clause be put in. I am not real positive about their bringing the draft of the contract at that time. I know the contract was finally laid in front of me. I read it over and said, 'Gentlemen, I cannot accept it that way.' I cannot remember whether the contract was written after we got together or whether it was brought there. I do remember that either then or later that the draft of the contract was presented to me. I am not sure as to how the addition to the contract was made. I draw too many contracts to be able to state, but I know there was a change made from the original, and they submitted it to me. I don't know whether the last paragraph was added to the first, second or third drafts that were submitted to me. I want the court to understand that the original draft of the contract submitted to me by Sedgwick, Good and Hummel had no reference in it to the right of cancellation *by either party.*"

Mr. Lytle, one of the defendants, testified in substance:

"I had conversations at various times and places with the officers of the Good Milking Machine Company with reference to the right of cancellation and annulment of the contract. It was talked over at the bank, and the statement, on the part of the individuals forming that company was, that they had no idea or intention of holding us to this contract if the machines were not what they were represented to be, and in case we pushed the sale and failed to sell the machines, that they would not expect any further effort on our part to carry

out the contract, and it would be dropped.'' He further said
that after they (the defendants) had made and sent out sev-
eral machines, Mr. Good came to Mitchell and made the state-
ment that he was afraid if he couldn't make the machines
do different, that the Galloway Company or Mr. Galloway
would throw up the contract. The cancellation feature of the
contract was mentioned by the members of the company at
the time the contract was talked over in Leavitt & Johnson's
Bank. At that time, I don't know that there was any particu-
lar clause of the contract discussed, and their intention in
drafting the contract was, that if we did not find the business
proved what they represented, or if we couldn't sell them
that it was not their intention to hold us up. The matter
could be dropped, and that the contract would provide for
such contingency. The contract was drawn afterwards.''

The foregoing are the positive statements of Galloway
and Lytle as they appear in the record. The time, place, and
circumstances of the conversations are left in some confusion.
The mind often retains the ultimate material fact, without
retaining a clear vision of the surrounding conditions at the
time. These ultimate facts are adhered to through all the
testimony of these witnesses, and are shown by the testimony.

Mr. Sedgwick, called for the defendant, said that there
was no conversation in his presence touching the right of the
defendants to cancel the contract; that he had a conversation
with them, but isn't sure whether Mr. Lytle was present. He
said that following that conversation, he prepared a draft of
the contract proposed to be entered into. ''I gave this draft
to Mr. Hummel or Mr. Good. In this contract, I inserted
this paragraph: 'The parties of the second part further agree
to push the sale of the aforesaid machines in good faith and
should they fail to sell the number of machines hereinbefore
required, then this contract may be forfeited at the option of
the party of the first part.' The subject matter of this para-
graph was never discussed with Mr. Galloway and myself,
nor by Mr. Hummel and Mr. Good at the conference at the

Galloway factory. I inserted this as the result of a conversation had with Mr. Good and Mr. Hummel after the conversation with Mr. Galloway. It was inserted for the reason that if they should not sell the number of machines required, we ought to have a right to cancel the contract. We were building a few machines at the candy factory, and by our arrangements with Galloway, we were going out of business. The contract, as finally entered into, was submitted to me, before its execution, by either Mr. Hummel or Mr. Good. I had no further conversation with Galloway. The subject matter of the cancellation of this contract was never discussed between myself and Mr. Galloway or Mr. Lytle, at any time before the execution of this contract, and I never heard any conversation upon that subject. I never compared the contract sued on, and the one prepared by me, to determine whether they were exactly alike, except the last two clauses.''

Hummel testified that there was nothing ever said between him and Galloway or Lytle as to their right to forfeit the contract proposed to be entered into, in case they failed to sell the number of machines that they agreed to sell. This matter was never discussed at any meeting; that Galloway never objected to any feature in the contract originally prepared by Sedgwick, except a provision with reference to hiring a superintendent. He further testified on cross-examination that the royalties were the main thing, and that is all that was discussed there. Nothing further was discussed except in a general way. There was nothing said with regard to the forfeiture. He further said that only two machines had been finished, prior to the time this contract was entered into.

Good, called on the part of the defendants, testified that there was nothing said with reference to giving either party a right to cancel the contract; that the only objection made by Galloway to the draft made by Sedgwick was as to hiring a superintendent, and at the time the contract was signed, he made no objection to the last paragraph, wherein it provides in case he pushed the sale of this machine in good faith,

and was unable to sell the amount required by the contract, that the party of the first part, (meaning the Good Milking Machine Company), could forfeit the contract. He says he made no objection to that part of the contract. He also denies having had any conversation with Mr. Lytle at Mitchell, as testified to by Lytle.

This is practically all the evidence upon the question under consideration. It is insisted by appellant that this evidence did not justify the court in re-forming the contract as it did, and this is based upon the thought that to authorize the re-formation of a written instrument, the proof must be clear and satisfactory. See *McTucker v. Taggart*, 29 Iowa 478, and cases therein cited; see also *Stewart v. McArthur*, 77 Iowa 162.

1. RE-FORMATION OF INSTRUMENTS: evidence: sufficiency to justify re-formation.

Evidence is for the purpose of conveying to the mind a knowledge of the existence or nonexistence of disputed facts. When the evidence is such that the mind readily reaches a satisfactory conclusion as to the existence or nonexistence of a fact in dispute, then the evidence is, of necessity, clear and *satisfactory*.

While there is dispute in this record as to what was said and done touching that part of the contract now in dispute, a reading of the whole record brings the mind to an abiding conviction that the defendants contended, at all times, during the negotiations preceding the writing now in question, that each party should have a right to cancel the contract in the event the adventure proved unsuccessful. From what was said and done we are satisfied that the plaintiff knew and understood, at the time the writing was made, that the defendants intended by the expression, and understood the expression to mean, that either party should have a right to cancel the contract in such event. The plaintiff originally prepared the writing to express the contract, and in it inserted the clause that the plaintiff alone should have a right

2. RE-FORMATION OF INSTRUMENTS: mistaken use of words.

to cancel the contract. In the contract, as finally executed, the words limiting the right to the plaintiff to cancel the contract were not inserted, yet words were left there indicating a right to forfeit the contract by someone. In the light of what was said and done, we are satisfied that both parties, *at the time,* understood these words to mean that the right of forfeiture should be vested in each whenever the conditions arose justifying a forfeiture.

3. RE-FORMATION OF INSTRUMENTS: evidence: oral: surrounding circumstances: nature of subject-matter.

We are not limited in the determination of this case to the verbal testimony of the witnesses upon the stand, but may take into consideration all the facts and circumstances attending the parties at the time of the making of the contract, and these often have more probative force than the oral testimony.

The parties were, at the time, entering upon an enterprise with an unexplored field, the outcome of which could not then be definitely determined. It was in one sense a mutual or joint enterprise looking to the future for a successful issue. There were obligations to be performed in the future, resting upon more or less uncertainty as to the outcome of the enterprise. It was but natural and reasonable that each should feel that if the enterprise proved unsuccessful because of its uncertain character, each should be permitted to withdraw from the enterprise, and this seems to have been the dominant thought in the mind of the defendants, and we feel certain from this record that the plaintiff, at the time the contract was prepared, understood and appreciated this attitude of the defendants, and consented that the contract should be so written, but in attempting to reduce the agreement and the understanding of the parties to writing, they did not use the words which aptly express this intent and purpose. At least, we should judge so from the controversy that has now arisen.

It is claimed, however, that equity will not reform a mistake of law as to the legal effect of a contract actually made.

This may be true, but the argument does not meet the situa-

**4. RE-FORMATION OF INSTRU- MENTS: grounds: "mistake of law."**

tion here. There is a great difference in the application of this rule by which equity re- forms the *written evidence of contracts,* and the rule that equity denies to a party a right to have a contract so re-formed as to give it a legal effect other and different from that which flows from the contract actually made. No court has the power to make a new contract for the parties. When a contract is made and executed and re- duced to writing just as the parties intended to make it, and have it, the court has no power to re-form the *contract*. There is a difference between re-forming a contract and re-forming the written evidence of a contract. We would say here that ordi- narily a contract precedes the act of reducing it to writing. Reducing it to writing is the act of choosing proper and apt words and phrases to express the contract or agreement upon which the minds of the parties met. This may or may not be done, and if the instrument as written fails to express in apt and proper words the contract upon which the minds of the parties had met, and fails to express the contract itself as actually entered into, whether by such failure it does or does not give to it a legal effect other and different from what was intended by the parties, then equity will re-form the in- strument of writing so as to make it express the real contract which the parties made.

As said in *Marshall & Sharp v. Westrope,* 98 Iowa 324, 331: "The doctrine is settled that, in general, a mistake of law, pure and simple, is not adequate grounds for relief. The rule is well settled that a simple mistake by a party as to the legal effect of an agreement which he executes, or as to the legal result of an act which he performs, is no ground for either defensive or affirmative relief. The principle under- lying this rule is, that equity will not interfere for the pur- pose of carrying out an *intention* which the parties *did not have* when they entered into the transaction, but which they might or even would have had, if they had been more carefully

informed as to the law. . . . If an agreement is what it was intended to be, equity will not interfere with it because the parties have mistaken its legal import and effect.'' And in that case it was said: ''We have seen that if the parties, at the time they made their agreement,—at the time their minds met,—mutually understood that the defendant was to guarantee all the accounts which he transferred to the plaintiffs, but that, in the process of reducing their agreement to writing they used the word 'foals,' under the mistaken idea that it was as broad as the word, 'accounts,' then equity will afford relief.''

So in the case at bar, we are satisfied that the words used in the contract as actually signed, to wit, ''The parties of the second part further agree to push the sale of the foresaid machines in good faith, and should they fail to sell the number of machines hereinbefore required, then this contract may be forfeited,'' were used under the mistaken idea that it was broad enough to cover the right of forfeiture by either party. The mistake was not of law, but a mistake in the use of the words shown to clearly express the actual contract between the parties. What is sometimes denominated as a mistake of law is only a mistake as to the legal meaning. Where it is clearly shown that the words used do not express the real contract on which the minds of the parties met, and the mistake in the use of the words was mutual, equity will intervene and re-form the contract so as to make it express the true agreement upon which the minds of the parties met. As said in *Coleman v. Coleman,* 153 Iowa 543, on page 552, ''If the contract as written fails to express the agreement on which the minds of the parties met, it is not their agreement and the true agreement has not been executed (that is reduced to writing), and in such case, equity will grant relief, without regard to the cause of the failure to express the contract as actually made, whether it be from fraud, mistake in the use of language, or any other thing which prevents the expression of the intention of the parties,'' citing authorities.

It is further said in that case, quoting from Justice Washington in *Hunt v. Rousmaniere's Admrs.*, 26 U. S. (1 Pet.) 1, 7 L. Ed. 27: "Where an instrument is drawn or executed which professed or is intended to carry into execution an instrument . . . previously entered into, but by mistake of the draughtsman either as to fact or law, does not fulfill the intention, or violates it, equity will correct the mistake so as to produce a conformity to the agreement."

Where a contract has been entered into and expresses the agreement upon which the minds of the parties met as to what should or should not be done, equity will not relieve the parties because the legal effect of their contract is other and different from what they intended. There is a difference between reforming a *contract* so as to give it a different legal effect, and re-forming the *written evidence* of a contract so as to make it express the true contract, where, through mutual ignorance, the legal import of the language used does not express the contract as actually made.

As said in *Coleman v. Coleman,* "A mistake in a contract itself, springing from ignorance of the law, is one thing, and a mistake in the legal meaning, attributable to the words used to express the contract, is another."

All these questions are not involved in this case. This contract simply failed to fully express the real meaning and intent of the parties. The contract as written reads: "This contract may be forfeited," but does not say by whom. The contract as we find it, as actually made between the parties and intended to be incorporated in the writing, was, "This contract may be forfeited by either party." The mistake in the writing lies in the fact that the words used, without more, did not fully express the real intent of the parties in making the contract, and did not express in this respect the contract upon which the minds of the parties met. All that the court below did was to re-form the writing, not the contract, so as to make it to conform to the agreement previously entered into between the parties. There are no persuasive equitable

considerations manifest in the record in favor of the plaintiff, and we reach the satisfactory conclusion that the mistake complained of exists, and that the writing ought to be made to conform to the true intent of the parties, and this is all that was done.

The impression that this record has made upon us, after a careful reading of it, is reinforced and supported by the conclusion of the learned trial judge who had the parties and the witnesses before him, who had an opportunity to observe their demeanor on the stand and the fairness with which they responded to the questions asked. We have no grounds for interfering with his conclusion and judgment, and the case is, therefore,—*Affirmed.*

DEEMER, C. J., LADD and SALINGER, JJ., concur.