[No. 22327. Department Two. April 15, 1930.]

M. J. WOODS (*doing business under the firm name and style of M. J. Woods Motor Company*), *Appellant*, v. TOM DESMOND *et al., Respondents.*[1]

*Wesley Lloyd,* for appellant.

*Williamson, Freeman & Broenkow,* for respondents.

MAIN, J.—W. M. Doub began the foreclosure of a number of chattel mortgages by notice and sale in the

[1]Reported in 286 Pac. 856.

sheriff's office of Pierce county. M. J. Woods, the mortgagor, began an action in the superior court to transfer the foreclosure to that court, restrain the sale of the property covered by the mortgages, and also sought damages for conversion. Doub answered the complaint and by cross-complaint sought foreclosure of the mortgages. When the case came on for trial before the court without a jury, Woods moved for judgment on the pleadings, and before this motion was ruled upon, Doub moved to amend his cross-complaint, which was granted, and an amendment was made which put in issue the question whether a certain writing hereinafter mentioned embodied the agreement of the parties, or whether there had been a mutual mistake of fact at the time of its execution. The trial resulted in a judgment reforming the instrument and foreclosing the mortgages, from which Woods appeals.

The facts which are essential to be stated are these: Woods had for a number of years been engaged in the business of buying and selling automobiles, both new and used cars, in the city of Tacoma. Doub, the respondent, had been engaged in what is called in the record, "the finance business," which included the buying of automobile paper and the writing of insurance.

The Maryland Realty Company is a corporation, of which Doub was a large stockholder and directing head. October 1, 1927, the realty company, which was then the owner of certain lots in the city of Tacoma upon which a building had been erected which had been used for and was adapted to the use of an automobile sales room and shop, sold the same to the appellant for the sum of $22,000, no part of which was paid at the time. The contract provided for monthly payments thereafter and interest. After the execution of this contract, the appellant, who had been engaged in the automobile business at another location in the city,

moved to the property which he had purchased. In that he continued the buying and selling of automobiles, and the automobile paper he sold to the respondent. From time to time the respondent advanced to the appellant sums of money upon unsecured loans. During the month of March, 1929, the appellant became financially embarrassed. On the evening of the 28th of that month, he and the respondent met at the Elks' Club to discuss a settlement of their affairs, and at that time some agreement was orally made between them.

At this time the appellant was indebted to the respondent on unsecured loans in the sum of approximately $6,000, and the respondent held mortgages upon automobiles in the appellant's place of business which aggregated approximately $21,000. In addition to this, the appellant was contingently liable to the respondent to the extent of $50,000 upon contracts which the respondent had previously purchased from the appellant.

The day following the meeting in the Elks' Club, or the 29th of March, the parties again met, and the appellant conveyed the real estate covered by his contract, above referred to, to the Maryland Realty Company. At this time the appellant owed upon the property, including principal and interest, taxes and another item or two, approximately $25,000. He also was indebted to the respondent for shop equipment and interest approximately $1,000. At the time the quitclaim deed was delivered to the Maryland Realty Company, the respondent signed a release, which recited that the appellant Woods was discharged

"  .  .  . of any and all liability on account of any notes, mortgages, conditional sale contracts, chattel mortgages, liens and/or all other obligations held by the undersigned and upon which the said M. J.

Woods is liable or may be liable as principal, surety or guarantor, the purpose of this release and discharge being to cover all instruments of the character described from the beginning of time to the present date, and the undersigned further covenants that he will take such steps as may be necessary to extend the force and effect of this release and discharge to include all of these corporations and organizations in which the undersigned may have any interest and which now hold any obligations of the character herein described and upon which the said M. J. Woods or the community composed of M. J. Woods and Georgia P. Woods are in any way liable.''

This release and discharge was signed and acknowledged by the respondent Doub and delivered to the appellant. The day following the delivery of the deed to the Maryland Realty Company and the release just mentioned, the respondent went to the appellant's place of business, apparently for the purpose of checking over the automobiles which were covered by the chattel mortgages above referred to. At this time a controversy took place between the parties, the details of which are not here material. After the controversy, Woods and Doub checked the automobiles. A few days later the respondent brought an action as above stated to foreclose the mortgages through the sheriff's office, and the present action was the result of that proceeding.

The appellant complains of the ruling of the trial court in permitting the amendment after the case was called for trial. At this time the appellant claimed that, in view of the amendment, he was not prepared to proceed with the trial. The court continued the case until the following day at 10 o'clock, a. m. There is nothing in the record from which it can be found that the appellant was in any way prejudiced by the fact that the case was not continued for a longer period of time. In this respect there was no error.

■ The important and principal question upon this appeal is whether the trial court erred in entering a judgment reforming the release. As drawn, it recited the release of notes and mortgages, conditional sale contracts and chattel mortgages, liens and the other obligations therein mentioned. The instrument, as reformed by the judgment, did not include the chattel mortgages upon the automobiles, but did include all unsecured obligations of the appellant to the respondent, including the contingent obligations. Whether the instrument should have been reformed depends upon whether it embodied the agreement that the parties had entered into the previous evening at the Elks' Club and upon which, at that time, their minds had met.

The appellant says that the release and discharge itself embodies the agreement, and the respondent says that it does not. The appellant testified that the respondent was indebted to him by reason of a reserve fund to protect against possible losses, which was figured at two per cent, a bonus of two and one-half per cent to be paid appellant provided he should forward to Doub all of his automobile paper for a period of three years, and twelve and one-half per cent of the insurance premiums. The total of these items which the appellant claims the respondent owed him was approximately $14,752. The respondent denied that there was any agreement as to any of these matters, and testified that the first he had heard them mentioned was when the appellant testified to them upon the trial. The trial court made no finding whatever, but in his oral opinion at the conclusion of the trial stated that he did not believe that any agreement was entered into between the parties whereby the appellant was to receive twelve and one-half per cent of the premiums of insurance, or the other items mentioned.

As to what the exact transaction was upon which the parties agreed at the Elks' Club on the evening of March 28, they alone know, and their testimony is in dispute. The appellant's testimony is somewhat weakened by the fact that he, after the transaction, made statements to two or three disinterested witnesses which were inconsistent with his theory of the case upon the trial and with his testimony.

After giving attentive consideration to all the evidence, we are of the opinion that the agreement at the Elks' Club, upon which the minds of the parties at that time met, did not include the release of the chattel mortgages.

Whether, under the law, the respondent was entitled to have the release reformed, we will now consider. He testified that, at the time he signed the release, he read it over two or three times and knew what it contained. It is apparent that at that time he did not believe that a mere recital in the release would discharge the chattel mortgages, but that they could only be discharged and released in the manner provided by law and a description of the property covered by them.

In the comparatively recent case of *Hazard v. Warner*, 122 Wash. 687, 211 Pac. 732, 31 A. L. R. 381, the law with reference to the reforming of an instrument for mutual mistake was fully considered and we will quote at some length from that case. It was there said:

"Many authorities are cited pro and con upon the question here presented, and while not greatly differing in principle, the application so differs as to result in hopeless confusion, and render a review of the authorities wholly valueless. The generally accepted modern rule is well stated in 23 R. C. L. at page 326, as follows:

" 'Many well considered modern cases show a strong tendency to adopt the position that the main object of equitable jurisdiction should be to effectuate the inten-

tions of the parties to the instrument in question, and that any mistake made by them which would defeat such intentions should be corrected in equity for the purpose of putting into effect such intentions, whether the mistake in question be one of law or of fact. And this is so although the parties knew what words were employed and their ordinary meaning.'

"We have recently considered this question in *Hendrickson v. Lyons*, 121 Wash. 632, 219 Pac. 1095, where it is said:

" 'It is undoubtedly a general rule that equity will not grant relief against mistakes of law, but the rule, like many others, has its exceptions, and we are clear that the case here is within an exception. As was said by the supreme court of the United States in *Hunt v. Rousmaniere*, 1 Pet. (U. S.) 1:

" ' "When an instrument is drawn and executed, which professes, or is intended, to carry into execution an agreement, whether in writing or by parol, previously entered into; but which, by mistake of the draftsman, either as to fact or law, does not fulfill, or which violates, the manifest intention of the parties to the agreement, equity will correct the mistake, so as to produce a conformity of the instrument to the agreement."

" 'In *Oliver v. Mutual Commercial Marine Ins. Co.*, 2 Curt. (U. S.) 277, it was said:

" ' "There is a wide distinction between a case where an instrument is, what the parties agreed, it should be, but its legal effect is unexpected, and a case where an instrument was designed to carry into effect an existing binding agreement, but, by mistake fails to do so. In the former case the party never had a right to anything more than he has got. He may be disappointed in finding that what he acquired was less valuable than he expected, but he acquired all he bargained for, and there is no ground upon which a Court of Equity can give him anything more. On the contrary, in the latter case, the party had a complete right, by an existing contract, to something which, by mistake, he has failed to get. And this contract, and the right under it, still subsists, in point of equity; because,

though the parties attempted to execute the contract, by mistake, they failed to execute it; and therefore, a Court of Equity interposes, and upon the footing of an existing contract, unexecuted, proceeds to put the party in that condition to which his contract entitles him. And in this class of cases I apprehend it is wholly immaterial whether the party failed to obtain that to which he was entitled through a mistake of fact or of law.''

'' 'Later cases from the supreme court of the United States maintain the same doctrine (see *Waldon v. Skinner*, 101 U. S. 577), and our own cases of *Dennis v. Northern Pac. R. Co.*, 20 Wash. 320, 55 Pac. 210; *State v. Lorenz*, 22 Wash. 289, 60 Pac. 644, and *Murray v. Sanderson*, 62 Wash. 477, 114 Pac. 424, are to the same effect, although the precise question suggested was not discussed in the opinions. Indeed, it seems to be the almost universal current of authority that mistakes of this sort will be relieved from in equity, whether they be strictly mistakes of law or mistakes mixed of law and fact.' ''

As pointed out in the excerpt quoted in that opinion from the court's opinion in *Oliver v. Mutual Commercial Marine Ins. Co.*, 2 Curt. (U. S.) 277:

''There is a wide distinction between a case where an instrument is, what the parties agreed, it should be, but its legal effect is unexpected, and a case where an instrument was designed to carry into effect an existing binding agreement, but, by mistake fails to do so.''

In the case now before us, the agreement which was made at the Elks' Club was not carried into effect by the release. This is not a case where the instrument is one that the parties have agreed upon, the legal effect of which was unexpected. As pointed out in the excerpt quoted from Ruling Case Law in the case cited, even though the respondent in the case now before us knew that the release mentioned mortgages, this would not prevent a reformation if in fact the release was not the agreement which the parties had entered into and

upon which their minds had met the evening before. Under the evidence in this case, and under the law as it is stated in *Hazard v. Warner, supra,* the respondent was entitled to have the instrument reformed, and the trial court correctly so adjudged.

The next question is whether the trial court erred in limiting the cross-examination of respondent. The appellant had testified to the twelve and one-half per cent insurance premiums, the two and one-half per cent bonus and the two per cent reserve, which he claimed that the respondent had agreed to allow him but which he had not paid. The respondent in his testimony unequivocally denied that any such agreement had ever been made, and stated that the first he had heard of it was upon the trial. On cross-examination of the respondent, the appellant sought to elicit from him whether he had not made a like or similar arrangement with other automobile dealers whose paper he was handling. To this an objection was made and sustained. The question was repeated a time or two, but each time objected to and the objection sustained. In the view that we have taken of the matter as above indicated, this question does not become very material. Even though the respondent had been permitted to answer the question and had testified that he had made a similar arrangement with other automobile dealers, it would not necessarily follow from that that he had made the same agreement with the appellant. This was a matter which was largely within the discretion of the trial court and much must be left to its judgment.

In Horwitz, Jones Commentaries on Evidence, vol. I, § 140, it is said (p. 702):

"It has been repeatedly and truly said that the safest guide to the reception or rejection of evidence of similar transactions is the knowledge of the judge,

who applies in that regard common sense aided by precedents and analogous cases. Those cases are illustrative of so many varieties of similar instances that we adopt the method of utilizing some of them for our instruction rather than attempt the framing of any definite enunciation. It will not be presumed, for instance, in considering the vagaries of conduct either in civil or criminal matters, that a man has done a particular act because he did it once before, . . . "

The ruling of the trial court in rejecting this testimony does not constitute reversible error.

There are some other questions of minor importance discussed in the brief, all of which have been considered, but they do not appear to us to be of sufficient importance to require a detailed discussion. They bear more or less indirectly upon the principal question in the case, but they are not of controlling importance.

The judgment will be affirmed.

MITCHELL, C. J., FRENCH, FULLERTON, and HOLCOMB, JJ., concur.